PAUL A. BONIN, Judge.
liSemmes Favrot sued his brother, James, initially seeking injunctive relief. Being mostly unsuccessful, he then amended his suit to claim that James had breach *1102 ed a contract with him or, alternatively, tortiously interfered with a contract. The trial court granted James’ motion for partial summary judgment and dismissed those added claims, but granted no other relief at that time. Semmes then appealed.
In response to our inquiry whether we had appellate jurisdiction to consider the partial summary judgment, which had not been designated as a final judgment by the trial court, Semmes and James jointly agreed that a ruling which affirmed the judgment would effectively terminate this litigation. We now convert Semmes’ appeal to an application for supervisory relief and grant the application.
Following our de novo review of the partial summary judgment, we agree that essential elements necessary to Semmes’ claims are absent such that no genuine issue of material fact exists and that James is entitled to judgment as a matter of law. We, therefore, amend the judgment in order to dismiss Semmes’ | ¡.lawsuit with prejudice and affirm the judgment as amended. We explain our decision in greater detail in the following parts.
I
In this Part we explain why we cannot exercise our appellate jurisdiction, and why, if we are to give full consideration to this matter at this time,[1] it is necessary for us to convert Semmes’ appeal to an application for supervisory relief.
The Louisiana Constitution of 1974 provides for our appellate jurisdiction and our supervisory jurisdiction. See La. Const. Art. 5, § 10(A). “Appeal is the exercise of the right of a party to have a judgment of a trial court revised, modified, set aside, or reversed by an appellate court.” La. C.C.P. ART. 2082. “Supervisory writs may be applied for and granted in accordance with the constitution and rules of the supreme court and other courts exercising appellate jurisdiction.” La. C.C.P. Art. 2201. As we have observed, “the difference between supervisory jurisdiction and appellate jurisdiction is that the former is discretionary on the part of the appellate court while the latter is invo-cable by the litigant as a matter of right.” Livingston Downs Racing Ass’n, Inc. v. Louisiana State Racing Com’n, 96-1215, p. 3 (La.App. 4 Cir. 6/5/96), 675 So.2d 1214, 1216.
“A final judgment is appealable in all cases in which appeals are given by law, whether rendered after hearing, by default, or by reformation under Article [■¡1814.” La. C.C.P. Art. 2083 A. “A judgment that determines the merits in whole or in part is a final judgment.” La. C.C.P. Art. 1841. “No appeal may be taken from a partial final judgment under Article 1915(B) until the judgment has been designated a final judgment under Article 1915(B). An appeal may be taken from a final judgment under Article 1915(A) without the judgment being so designated.” La. C.C.P. Art. 1911.
“A judgment that does not determine the merits but only preliminary matters in *1103 the course of the action is an interlocutory judgment.” La. C.C.P. ÁRT. 1841. “An interlocutory judgment is appealable only when expressly provided by law.” La. C.C.P. Art. 2088 C; see, e.g„ La. C.C.P. ART. 3612 B (relating to the denial or the granting of a preliminary injunction), or La. C.C.P. Art. 592 A(3)(b) (relating to certification in class actions). If not expressly provided by law, there is no right to appeal an interlocutory judgment. See, e.g., La. C.C.P. Art. 968 (“An appeal does not lie from the court’s refusal to render any judgment on the pleading or summary judgment.”).
Therefore, in order to determine whether a particular judgment or order is appealable as of right, it must be determined whether the judgment is (1) a final judgment which has determined the merits in whole, La. C.C.P. Art. 1911; (2) a partial final judgment which does not require designation as a final judgment, La C.C.P. Art. 1915 A; (3) a partial judgment which requires designation as a final judgment, La C.C.P. Art. 1915 B(l); (4) an interlocutory judgment from which an appeal is expressly provided by law, La C.C.P. Art. 2083 C, or (5) an | ¿interlocutory judgment from which an appeal is not expressly provided by law, id. See also LaDonte A. Murphy, Access to Appellate Review: Writs, Appeals, and Interlocutory Judgments, 34 S.U.L.Rev. 27 (2007).
A partial judgment which requires designation as a final judgment by the trial court (the third category, ante) but which has not received such a designation is not an appealable judgment. See La. C.C.P. Art. 1915 B(2) (“In the absence of such a determination and designation, [any such order or decision] ... shall not constitute a final judgment for the purpose of an immediate appeal.”) Such an undesignated judgment, like an interlocutory judgment, “may be revised at any time prior to rendition of the judgment adjudicating all the claims and the rights and liabilities of all the parties.” La. C.C.P. ART. 1915 B(2); see, e.g., Regions Bank v. Weber, 10-1169, p. 1 (La.App. 4 Cir. 12/15/10), 53 So.3d 1284 (“An interlocutory judgment may be reconsidered or revised upon proper motion at any time until the rendition of a final judgment.”), citing to Magallanes v. Norfolk Southern Railway Co., 09-0605, p. 4 (La.App. 4 Cir. 10/14/09), 23 So.3d 985, 988. See also Roger A. Stetter, Louisiana Civil Appellate PROCEDURE, § 3:20 (2010-2011 ed.) (“Any partial judgment that does not dismiss a party and that is not expressly authorized by Article 1915 is interlocutory in character rather than final.”).
Insisting that a partial judgment be designated as final because “there is no just reason for delay” allows us to enforce the “policy against multiple appeals and piecemeal litigation.” R.J. Messinger, Inc. v. Rosenblum, 04-1664, p. 13 (La.3/2/05), 894 So.2d 1113, 1122; see also 1 Frank L. Maraist & Harry T. Lemmon, Louisiana Civil Law Treatise-Civil Procedure, § 14.3, p. 363 (1999). Such insistence also helps to “ensure that our courts operate under principles of sound judicial administration to promote judicial efficiency and economy.” Id.
The judgment which Semmes “appeals” was a partial summary judgment. The judgment did not dismiss any party. See La. C.C.P. Art. 1915 A(l). The judgment purports only to dismiss Semmes’ claims for breach of contract and for tor-tious interference with a contract. “A summary judgment may be rendered dis-positive of a particular issue, theory of recovery, cause of action, or defense, in favor of one or more parties, even though the granting of the summary judgment does not dispose of the entire case.” La. *1104 C.C.P. Art. 966 E. Such a partial summary-judgment, however, cannot be appealed without a designation of finality by the trial court. See La. C.C.P. Arts. 1911 and 1915 A(3). But Semmes had not obtained the requisite trial court designation of a “final judgment” and, therefore, has no right to a revision, modification, or reversal by an appellate court.
Without a designation as a final judgment, the proper procedural vehicle for the review of this partial summary judgment was for Semmes to apply for a supervisory writ. La. C.C.P. Art. 2201; see also Lalla v. Calamar, N.V., 08-0952, p. 6 (La.App. 4 Cir. 2/11/09), 5 So.3d 927, 931. “A court of appeal has plenary power to exercise supervisory jurisdiction over district courts and may do so at any time, according to the discretion of the court.” Herlitz Constr. Co., Inc. v. Hotel Investors of New Iberia, Inc., 396 So.2d 878, 878 (La.1981). Thus, we have the | fidiscretion to consider this judgment under our supervisory authority. And we have in similar circumstances converted “appeals” of non-appealable judgments to applications for supervisory writs in those cases in which the motions for appeal were filed within the thirty-day period allowed for the filing of applications for supervisory writs. See Ordoyne v. Ordoyne, 07-0235 (La.App. 4 Cir. 4/2/08), 982 So.2d 899; Ganier v. Inglewood Homes, Inc., 06-0642 (La.App. 4 Cir. 11/8/06), 944 So.2d 753; Rule 4-3, Uniform Rules-Courts of Appeal. In Francois v. Gibeault, 10-0180, p. 2 (La. App. 4 Cir. 8/25/10), 47 So.3d 998, 1000, we stated:
In the interest of justice, and especially considering that this appeal was filed within the delays allowed for applying for supervisory writs, see Rule 4-3, Uniform Rules-Courts of Appeal, we convert the pending appeal to a writ application for review under our supervisory jurisdiction, (citations omitted).
Semmes, too, filed his motion for appeal within the delays allowed for applying for supervisory writs.
We, moreover, are persuaded by the parties’ joint representation,[2] confirmed by our own independent review of the record, that the exercise of our supervisory jurisdiction will result in a final disposition of all issues in this case and that there is no reason to remand the matter for the rendition of a final appeal-able judgment. When action by our court “will terminate the litigation, and where there is no dispute of fact to be resolved, judicial efficiency and fundamental fairness to the litigants dictates that the merits of the application for supervisory writs should be 17decided in an attempt to avoid the waste of time and expense.” Herlitz Constr. Co., Inc., 396 So.2d at 878; see also Alex v. Rayne Concrete Service, 05-1457, p. 7 (La.1/26/07), 951 So.2d 138, 145 n. 5.
Therefore, we convert Semmes’ appeal to an application for a writ of supervisory review and grant the writ.[3]
*1105 II
In this Part we briefly address the standard for our review of a summary judgment. We review a summary judgment de novo. See King v. Parish National Bank, 04-0337, p. 7 (La.10/19/04), 885 So.2d 540, 545.
The burden of proof to show that there is no genuine issue of material fact and that the mover is entitled to judgment as a matter of law is on the mover. See La. C.C.P. Art. 966 C. But, when the movant will not bear the burden of proof at a trial on the merits, the burden of proof “on the motion does not require him to negate all essential elements of the adverse party’s claim, ... but rather to point out to the court that there is an absence of factual support for one or more elements essential to the adverse party’s claims ...” La. C.C.P. Art. 966 C(2); King, 04-0337, p. 8, 885 So.2d at 545.
Once the mover has pointed out such absence, the adverse party must “produce factual support sufficient to establish that he will be able to satisfy his evidentiary burden at trial.” Id. If the adverse party will be unable to satisfy his evidentiary burden at trial, “there is no genuine issue of material fact.” Id. See also Brungardt v. Summitt, 08-0577, pp. 10-11 (La.App. 4 Cir. 4/8/09), 7 So.3d 879, 886-887.
Here, as we will elaborate, James will not have the burden of proof at trial on either the breach of contract claim or the tortious interference claim.[4] In Parts IV and V, post, we will set forth the essential elements of each claim. As to each claim, “[i]f even one of these essential elements is found lacking, the cause of action fails.” Kennedy v. Sheriff of East Baton Rouge, 05-1418, p. 16 (La.7/10/06), 935 So.2d 669, 681; see also Mitchell v. Villien, 08-1470, p. 7 (La.App. 4 Cir. 8/26/09), 19 So.3d 557, 563. Therefore, when James points out that Semmes is unable to satisfy his evi-dentiary burdens at trial, Semmes must produce sufficient factual support, otherwise there is no genuine issue of material fact and James is entitled to judgment as a matter of law.
Ill
In this Part we set forth some background facts to aid in understanding the controversy as well as particularly describe the agreements or contracts around which the brothers are arguing.
Many years ago Mortimer Favrot, a Tulane- and Harvard-educated architect, founded a real estate development firm along with Henry Shane. The firm has grown over the years and maintains an extensive presence in the New Orleans metropolitan area. The FavroUShane firm operates through many companies and subsidiaries. Until these events, Mortimer and Mr. Shane each owned one-half of the firm. These gentlemen began to plan for their retirement and for an orderly succession in the management and control of their firm. They each agreed to the other’s plans for the transfer of their respective interests.
19James had been working in the family business since he had finished school and was a trusted associate of his father. Mortimer described James as an expert in real estate acquisition, development, and finance; indeed, he characterized James as the most important person in the firm after himself and Mr. Shane.
Semmes had been engaged in the private practice of law.
*1106 On September 23, 2003, Mortimer and his sons signed a stock transfer agreement in which the father expressly obligated himself to sell to his sons, and the sons obligated themselves to purchase, 98% of his interest in the firm. There were, however, conditions to the agreement, which we, to some extent, here simplify. The agreement set out how the purchase price was to be calculated and that the purchase price was to be evidenced by a non-recourse promissory note on which interest only was to be paid until the note ballooned fifteen years later; the transferred stock would be pledged for the repayment of the note, but there would be no personal liability for any deficiency beyond the value of the stock. Most importantly for the purposes of this matter, the transfer of the stock would occur only on the third anniversary date of Semmes’ full-time employment in the family business. If at that time both James and Semmes were full-time employees of the firm, James would purchase 55% of the stock and Semmes 45%; otherwise, if only one was still employed at that time, he would purchase 100% of the stock.[5]
| inLater, on October 22, 2003, the father and sons executed an employment compensation agreement in which Mr. Shane intervened, which primarily provided for the calculation of the salaries and the allocation of other income from the firm to the brothers. This agreement expressly contemplated that the brothers’ employment with the firm could be involuntarily terminated “in the sole discretion” of the firm as well as that either brother could voluntarily withdraw from his employment. This agreement also supplied the start date for Semmes’ full-time employment as January 1, 2004.[6] Semmes commenced his at-will employment and James continued his at-will employment with the firm.
The brothers soon started squabbling. Their disagreements escalated and the nature of their disputes intensified. Separately they each had recourse to their father first to mediate, then to intervene, and finally to choose between them. On some unspecified date in March 2005, Mortimer fired Semmes. James continued his full-time employment with the firm and, because of Semmes’ involuntary termination, was entitled to purchase 100% of the stock to be sold by Mortimer.
After Semmes’ firing, Mortimer and James modified the stock transfer agreement on terms more onerous to James. In this renegotiated agreement, a portion of the purchase price paid by James would be paid to a trust fund from which all of Mortimer’s children, including Semmes, benefit. Also, Mortimer has extended to Semmes a $1,000,000 line of credit in order to engage in |H entrepreneurial activities, and Semmes has drawn on the credit line. Additionally, the firm refers legal work to Semmes on a fee-basis.
Semmes directs this action against only James; he has not sued his father.[7]
Initially, Semmes’ suit was for injunctive relief.[8] He obtained a temporary restrain *1107 ing order against James prohibiting the alienation of the Favrot-Shane stock shares. At the trial of the hearing for a preliminary injunction, the TRO was dissolved. The court denied a preliminary injunction except to the extent that James consented to a preliminary injunction prohibiting the alienation of 45% of the shares during the pendency of the lawsuit.[9]
Later, Semmes amended his lawsuit by seeking damages from James on the breach of contract and tortious interference claims. James filed his motion for partial summary judgment in which he sought the dismissal of the claims. Sem-mes opposed the motion. After a hearing, the trial court granted the summary judgment, dismissing the two claims. Semmes filed a devolutive appeal.
IV
In this Part we explain why James is entitled to judgment as a matter of law on Semmes’ breach of contract claim. At the outset we note that “[t]he burden of proof in an action for breach of contract is on the party claiming rights under the contract.” Vignette Publications, Inc. v. Harborview Enterprises, Inc., 00-1711, p. 3 (La.App. 4 Cir. 9/12/01), 799 So.2d 531, 534.
1, ¡While Semmes argues that good faith binds the brothers “to cooperate with each other in order to attain the mutual end for which they entered the agreement,” he acknowledges that the stock transfer agreement has “inherently conflicting interests” and that a sole remaining brother would receive a “substantial financial benefit.” Critically, however, Semmes admittedly can point to no obligation expressed in the agreement which James is bound to perform for Semmes. So Semmes argues only that this so-called breach of contract claim arises out of James’ failure to perform what Semmes characterizes as James’ “implied obligation of good faith in performing under the 2003 Agreements.”
“Contracts must be performed in good faith.” La. Civil Code ART. 1983. But Semmes misapprehends the meaning of that codal provision. He argues that “good faith” is an obligation, independent and additional, to any specified obligation arising from the contract and that a breach of this so-called good-faith obligation is the same as a breach of contract. We disagree.
“A contract is an agreement by two or more parties whereby obligations are created, modified, or extinguished.” La. Civil Code Art. 1906. “An obligation is a legal relationship whereby a person, called the obligor, is bound to render a performance in favor of another, called the obligee. Performance consists of giving, doing, or not doing something.” La. Civil Code ART. 1906. Thus, a contract is a source of obligations. La. Civil Code ART. 1757.
But Semmes acknowledges that he is unable to identify in the stock transfer agreement (or the other agreements) any obligation for which James is bound to render performance in his favor. We have examined the stock transfer agreement and the compensation agreement as well as the oral agreement for at-will employment in order to identify what, if any, obligation James is bound to perform | ¡¡¡in favor of Semmes. Like Semmes and James, we too are unable to identify any legal relationship whereby James qua obli-gor is bound to render a performance in favor of Semmes qua obligee. See La. Civil Code Art. 1906. James need not give, do, or not do something in favor of Semmes. While James and Semmes are obligors of Mortimer, and they each owe a *1108 different performance to him, James owes nothing to Semmes.
The parties focus on the provisions of the stock transfer agreement, which we have previously described. As far as Sem-mes’ claim under consideration matters, the essence of that agreement is that if Semmes, once having commenced fulltime employment with the FavroWShane firm, and James, already in such employment, were to continue in full-time employment for a three-year period with the firm, at the end of the period their father, Mortimer, would sell 45% of his shares to Semmes and 55% to James; if only one of the two sons fulfilled the condition, then Mortimer would sell to that brother 100% of the stock.
We observe that the obligations under the stock transfer agreement are all subject to suspensive conditions. A condition is suspensive when the obligation, which is dependent upon an uncertain event, cannot be enforced until the uncertain event occurs. See La. Civil Code Art. 1767. At the time of the agreement, there were suspensive conditions which had to be fulfilled, i.e., the uncertain events had to occur, before the obligations must be performed: (1) Semmes’ hiring as a full-time employee, (2) James’ continued employment as a full-time employee, and (3) the continuous employment of James and/or Semmes for three years. Only upon the occurrence of these uncertain events would Mortimer be able to enforce James’ performance to purchase stock or Semmes’ performance to purchase stock; reciprocally, not until the occurrence could either James or 114Semmes enforce the provision that Mortimer sell his stock. These contractual obligations are reciprocal between the father and each son, and between each son and his father. See La. Civil Code Art. 1908. But there is no obligation between the brothers.
In order to clarify whether James is bound to Semmes under the provisions of the stock transfer agreement which we have under current consideration, we consult La. Civil Code Art. 1787, which provides:
When each of different obligors owes a separate performance to one obligee, the obligation is several for the obligors.
When one obligor owes a separate performance to each of different obli-gees, the obligation is several for the obligees.
A several obligation produces the same effect as a separate obligation owed to each obligee by an obligor or by each obligor to an obligee, (emphasis added)
On the one hand, James and Semmes are different obligors owing a separate performance to one obligee, Mortimer. Each son’s obligation to perform is not conditioned upon the other’s performance. On the other hand, Mortimer is one obli-gor who owes separate performance to each of his sons, who are different obli-gees. The resulting effect is the same as a separate obligation owed to each obligee by an obligor and by each obligor to an obligee. Thus, when an obligation is several, there is no resulting obligation between obligors or between obligees.[10]
The essential elements of a breach of contract claim are (1) the obligor’s un *1109 dertaking an obligation to perform, (2) the obligor failed to perform the obligation (the breach), and (3) the failure to perform resulted in damages to the 115obligee. See 1436 Jackson Joint Venture v. World Constr. Co., Inc., 499 So.2d 426, 427 (La. App. 4th Cir.1986). See also Hercules Machinery Corp. v. McElwee Bros., Inc., 2002 WL 31015598 at *9 (E.D.La.9/2/02) (“The central elements of a breach of contract action are the existence of a contract, a party’s breach thereof, and damages”). Thus, while we are satisfied that Semmes and James were parties to one or more contracts, Semmes has not shown that he can satisfy his burden to prove that James was bound to him for an obligation to perform certain tasks, that James breached any obligation, and that any breach of contract resulted in damages to Semmes.
Semmes, however, strenuously argues that James failed to perform his Article 1983 obligation of good faith. Semmes asserts that James’ good faith obligation is to not prevent Semmes from obtaining the benefits he expected from the stock transfer agreement. Professor Litvinoff describes such a meaning of good faith:
Another attempt to explain the meaning of good faith focuses on the benefits or advantages parties expect to derive from their contracts. In that approach, besides abstention from malice, good faith demands from each party abstention from any action or inaction that may prevent the other from obtaining the benefit that the latter warrantedly expected to obtain. That view is carried a step forward when the assertion is added that the duty of good faith may not only proscribe undesirable conduct, but may also require each party to take affirmative action to cooperate in the attainment of his goals by the other.... In sum, a promisee must not only not hinder the rendering of performance by his promisor, but also do whatever is necessary to enable the promisor to perform.
In civil-law terminology that view could be expressed by saying that an obligee, especially one who is also an obligor of a reciprocal obligation, should not only abstain from contributing to the failure of the cause of his obligor’s obligation, but must do as much as he can to allow that cause to remain, if possible, intact during the life of the contract.
11fiSaul Litvinoff, Good Faith, 71 Tul. L.Rev. 1645, 1665-1666 (June 1997) (emphasis added).
In the sphere of morality there is little doubt that contracting parties, especially reciprocal obligors and obligees such as the brothers Semmes and James, ought to conduct their affairs in such a spirit.
Judicial inquiry, however, into an obligor’s (or even in some cases an obligee’s [11]) good-faith performance of the obligation is not triggered by the morality of a party’s intentions, but is initiated only when the obligee has proven a failure to perform an obligation. Stated another way, we do not examine a party’s good faith (or bad faith) unless and until we find that the party has failed to perform an obligation, from which the obligee has sustained damages. “An obligor is liable for damages caused by his failure to perform a conventional obligation.” La. Civil Code Art. 1994. The extent of the obligee’s recoverable damages is then determined *1110 according to whether the obligor failed to perform in good faith or in bad faith. “An obligor in good faith is liable only for the damages that were foreseeable at the time the contract was made.” La Civil Code Art. 1996. In contrast, “[a]n obligor in bad faith is liable for all the damages, foreseeable or not, that are a direct consequence of his failure to perform.” La Civil Code Art. 1997; see also Revision Comments-1984 (b) (“An obligor is in bad faith if he intentionally and maliciously fails to perform his obligation.”).
Thus, judicial determination of good-faith (or bad-faith) failure to perform a conventional obligation is always preceded by a finding that there was a failure to perform, or a breach of the contract. See, e.g., Delaney v. Whitney Nat’l Bank, 96-2144, p. 18 (La.App. 4 Cir. 11/12/97), 703 So.2d 709, 718 (where terms of a nonquali-fied retirement plan and an Excess Plan agreement between employer and employee were at issue, the evidence showed “disagreement and confusion” but not “deliberate malice.” This court stated, “Bad faith generally implies actual or constructive fraud or a refusal to fulfill contractual obligations, not an honest mistake as to actual rights or duties.”); Adams v. First Nat’l Bank of Commerce, 94-0486, p. 2 (La.App. 4 Cir. 9/29/94), 644 So.2d 219, 222 (where a home mortgage note was at issue, “a breach of contract occurs if contractual discretion is exercised in bad faith, a term connoting fraud, deception, or sinisterly-motivated nonfulfillment of an obligation.” (emphasis in original)); Roba, Inc. v. Courtney, 09-0508, p. 10 (La.App. 1 Cir. 8/10/10), 47 So.3d 500, 508 (where a breach of contract for right of way on land was at issue, bad faith consisted of “designed breach of ... [a contract] from some motive of interest or ill will”); MKR Services, L.L.C. v. Dean Hart Constr., L.L.C., 44,456, p. 7 (La.App. 2 Cir. 7/8/09), 16 So.3d 562, 566 (where a breach of contract for construction of an apartment complex was at issue, “The term bad faith means more than mere bad judgment or negligence, it implies the conscious doing of a wrong for dishonest or morally questionable motives.”); Nat’l Building & Contracting Co., Inc., v. Alerion Bank & Trust Co., 99-2561, p. 9 (La.App. 4 Cir. 11/8/00), 772 So.2d 938, 943 (where a construction loan agreement was at issue, obligors in bad faith owed “all damages foreseeable or not that were a direct consequence of their failure to perform under the agreements with NBC”); Galloway v. Tenneco Oil Co., 313 So.2d 317, 321 (La.App. 4th Cir.1975) (where a written option to purchase land was at issue, “if | lsthe debtor is not in bad faith the creditor is entitled [only] to loss of profits that were contemplated or foreseen by the parties at the time of the agreement.”).
We conclude that James carried his burden to point out the absence of an essential element for a breach of contract claim and that because Semmes admits that James was not bound to him for the performance of any contractual obligation which James failed to perform, Semmes is unable to produce facts to show that he could prove a breach of contract claim. Accordingly, James is entitled to judgment as a matter of law.
V
In this Part we begin by noting that the only contract to which Semmes was a party, which James could have arguably been accused of tortiously interfering with, is a contract for at-will employment. Both the stock transfer agreement and the employment compensation agreement were subject to Semmes’ oral at-will employment contract with the firm. “The employer-employee relationship is a contractual relationship. As such, an employ *1111 er and employee may negotiate the terms of an employment contract and agree to any terms not prohibited by law or public policy.” Quebedeaux v. Dow Chemical Co., 01-2297, pp. 4-5 (La.6/21/02), 820 So.2d 542, 545.[12]
Our law, however, does not recognize a cause of action for tortious interference with such at-will employment.
Until our Supreme Court’s decision in 9 to 5 Fashions, Inc. v. Spumey, Louisiana courts had expressed that any action based on tortious interference with a contract was absolutely barred. See 9 to 5 Fashions, Inc. v. Spurney, 588 So.2d 228, 234 (La.1989). And in that case the Supreme Court recognized “only a corporate officer’s duty to refrain from intentional and unjustified interference with the contractual relation between his employer and a third person.” Id. (emphasis added);[13] see also Thomas C. Galligan, Jr., Contortions Along the Boundary Between Contracts and Torts, 69 Tul. L.Rev. 457, 509 (December 1994).
The essential elements of a tor-tious interference with contract claim are (1) the existence of a contract or a legally protected interest between the plaintiff and the corporation; (2) the corporate officer’s knowledge of the contract; (3) the officer’s intentional inducement or causation of the corporation to breach the contract or his intentional rendition of its performance impossible or more burdensome; (4) absence of justification on the part of the officer; (5) causation of damages to the plaintiff by the breach of contract or difficulty of its performance brought about by the officer. See 9 to 5 Fashions, Inc., supra at 234. The plaintiff bears the burden of proof on each element. See Sun Drilling Products, Inc. v. Rayborn, 00-1884 (La.App. 4 Cir. 2001), 798 So.2d 1141, 1155-1159.
The gravamen of Semmes’ complaint is that James importuned their father to terminate Semmes’ employment with the Favrot-Shane firm. Semmes did not terminate his employment voluntarily. But “[a] man is at liberty to dismiss a hired servant attached to his person or family, without assigning any reason for doing so. The servant is also free to depart without assigning any cause.” La. Civil Code ART. 2747. See also Quebedeaux, id. (stating, “When the employer and employee are silent on the terms of the employment contract, the civil code provides the default rule of employment-at-will.”). “When an employee’s job is for an | ^indefinite term, the employment is terminable at the will of either the employer or the employee and an employer is at liberty to dismiss an employee at any time for any reason without incurring liability for the discharge.” Williams v. Touro Infirmary, 578 So.2d 1006, 1009 (La.App. 4th Cir.1991).
An at-will employee simply has no “legally protected interest in his employment necessary for a claim for tortious interference with a contract.” Durand v. McGaw, 93-2077, p. 4 (La.App. 4 Cir. 3/29/94), 635 So.2d 409, 411; see also Mendonca v. Tidewater Inc., 05-1166 (La.App. 4 Cir. 5/31/06), 933 So.2d 233.
*1112 And Semmes concedes that he was an at-will employee.[14]
But he argues that the decision of our court in Bains v. Young Men’s Christian Ass’n of Greater New Orleans, 06-1423 (La.App. 4 Cir. 10/3/07), 969 So.2d 646, has modified, if not abrogated, the precept that an at-will employee whose employment has been terminated by his employer can assert no claim for tortious interference with his contract of employment. We disagree.
Bains is wholly distinguishable from Semmes’ claim. The plaintiff in Bains understood that she had been offered employment by the defendant, who was her prospective employer. She argued that “since she was not yet an employee, the at will article [La. Civil Code art. 2747] should not apply to her.” Bains, 06-1423, p. 9, 969 So.2d at 652. The Bains plaintiff asserted her cause of action under a theory of detrimental reliance. Bains, 06-1423 at p. 6, 969 So.2d at 650. This |⅞1 court expanded its consideration of a possible[15] cause of action to one of a contractual obligation which might be immediately enforced against the prospective employer, subject to the resolutory condition of at-will termination which must be fulfilled in good faith. Bains, 06-1423, p. 8, 969 So.2d at 651. Bains can be construed only as authority for a detrimental reliance claim, which is what the dissent understood the dispute to concern,[16] or for a claim specifically to enforce a contract against one of the contracting parties. Our case is neither. Semmes, who was already an at-will employee, does not seek to establish detrimental reliance, and under Bains he could not. See Onovwerosuoke v. Dillard University, 08-0447, p. 4 (La.App. 4 Cir. 1/14/09) (unpub.)[17] (citing to Bains and holding, “Mr. Onovwerosuoke’s awareness that he was an at-will employee means that he cannot establish detrimental reliance.”). Also, Semmes is not attempting to demand performance by the employer, the Favrot-Shane firm, under his contract of employment.
Semmes’ claim against James which we have under consideration in this Part, sounds in tort. The source of liability is La. Civil Code Art. 2315: “Every act whatever of man that causes damage to another obliges him by whose fault it happened to repair it.” See also 9 to 5 Fashions, 538 So.2d at 231. Because this kind of claim is restricted to one “against a corporate officer for intentional and unjustified interference with contractual relations,” 9 to 5 Fashions, 538 So.2d at 234; see also Green v. The Administrators of the Tulane Educational Fund, 1999 WL 203262 *6 (E.D.La.4/8/99), we conclude that our decision in ¡22Bains is wholly inapplicable and does not modify in any way Louisiana law that an at-will employee has no legally protected interest in his employment and that he has no cause of action for intentional and unjustified interference by a *1113 corporate officer of his employer with his contract of at-will employment.
We conclude that James carried his burden to point out the absence of an essential element for a tortious interference of contract claim and that, because Semmes admits that he was an at-will employee of the firm, Semmes is unable to produce facts to show that he could prove tortious interference with a contract claim. See Mendonca, 05-1166 at pp. 3-4, 933 So.2d at 235. Because Semmes’ at-will employment is uncontested and because Bains has no application to at-will employment contracts, on this claim James is entitled to judgment as a matter of law.
DECREE
We convert Semmes Favrot’s appeal to an application for supervisory writs and grant the writ. We amend and affirm as amended the summary judgment and, accordingly, there is judgment herein in favor of James P. Favrot and against T. Semmes Favrot, dismissing with prejudice his suit.[18] See La. C.C.P. Art. 1673. All costs are taxed to T. Semmes Favrot. See La. C.C.P. Art. 2164.
APPEAL CONVERTED TO WRIT APPLICATION; WRIT GRANTED; AMENDED AND AFFIRMED AS AMENDED

. It is well-settled that although an interlocutory judgment may not itself be immediately appealable, it is nevertheless subject to review by an appellate court when a judgment is rendered in the case which is appealable. People of the Living God v. Chantilly Corp., 251 La. 943, 207 So.2d 752 (1968); La. C.C.P. Art. 1915 B(2); see also, e.g., Phillips v. Gibbs, 10-0175, p. 4 (La.App. 4 Cir. 5/21/10), 39 So.3d 795, 798. "When an unrestricted appeal is taken from a final judgment, the appellant is entitled to seek review of all adverse interlocutory rulings prejudicial to him, in addition to the review of the final judgment.” Roger A. Stetter, Louisiana Civil Appellate Procedure, § 3:32 (2010-2011 ed.).

. See Everything On Wheels Subaru, Inc. v. Subaru South, Inc., 616 So.2d 1234, 1242 (La.1993) ("Any party may apply for supervisory writs by showing that an immediate review may materially advance the termination of the litigation.”). Agreement by the parties alone that immediate review could terminate the litigation, however, does not require an intermediate appellate court to afford discretionary review. See also Banks v. State Farm Ins. Co., 30,868, pp. 1-2 (La.App. 2 Cir. 3/5/98), 708 So.2d 523, 524, and subsequent repeal of Article 1915's certification procedure providing for finality of judgment by specific agreement of the parties.

. The parties have fully briefed the issues and counsel orally argued the issues.

. See, e.g., Stanton v. Tulane Univ. of Louisiana, 00-0403, p. 10 (La.App. 4 Cir. 1/10/01), 777 So.2d 1242, 1248.

.There were additional, comparable provisions for the sale of Mortimer’s remaining 2% share of stock as well as conditional requirements to buy-out the shares of the other brother in the event of his voluntary or involuntary termination from the firm or his death or permanent disability after the two had acquired their father's stock.

. There is some issue as to whether the start date was February 1, 2004, but that date is inconsequential to our decision.

. Semmes did not sue Mortimer either as an individual or as a partner of any or all of the corporations of which Mortimer was an officer and/or director.

. Semmes filed a petition for TRO and injunc-tive relief on January 26, 2007.

. See n. 17, post. The injunction was issued on February 6, 2007.

. Several obligations are thus contrasted with joint obligations (whether divisible or indivisible) and solidary obligations. See La. Civil Code Arts. 1786 et seq. In his Reply Brief Semmes argues that "in this case a contract does exist between James and Sem-mes. It is precisely by virtue of the fact that James and Semmes are both parties to the same contracts and that they have interrelated obligations under those contracts that James owed a legal duty of good faith to Semmes.” We disagree with this argument.

. See La. Civil Code Art. 2003, in part: "An obligee may not recover damages when his own bad faith has caused the obligor’s failure to perform or when, at the time of the contract, he has concealed from the obligor facts that he knew or should have known would cause a failure.”

. The decision does reference causes, not applicable here, for which termination of an at-will employee is unlawful or impermissible.

. The U.S. Fifth Circuit in SMP Sales Management, Inc. v. Fleet Credit Corp., 960 F.2d 557, 559 (May 15, 1992), refers to tortious interference with contractual relationships as "a newly recognized theory of liability in the state of Louisiana [citation omitted]. Tortious interference with contract is a tort, based on duties arising from La. Civ.Code Art. 2315.”

. The employment compensation agreement clearly expressed that James or Semmes could be involuntarily terminated in the sole discretion of the firm.

. See Bains, 06-1423, p. 10, 969 So.2d at 652 (emphasis added): "[T]here are certain scenarios in which the law may offer Ms. Bains relief.” And ”[I]f plaintiff can prove that the defendant acted in bad faith there may be a remedy under our civil code” Id.., 06-1423, p. 9, 969 So.2d at 652. See also Allbritton v. Lincoln Health System, Inc., 45,537, p. 3 (La.App. 2 Cir. 10/20/10), 51 So.3d 91, 96.

. See Bains, 06-1423 at p. 10, 969 So.2d at 652 (Armstrong, C.J., and Bagneris, J., dissenting).

. See La. C.C.P. Art. 2168 B.

. This ruling necessarily dissolves the preliminary injunction which issued on February 6, 2007. Also, our decree moots the need to address Semmes’ assignment of error regarding the trial court’s interlocutory order denying his motion to compel James’ financial records.